## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **CRIM. NO.: 10-cr-0042** |
| v. | ) | |
| | ) | |
| KHALED SALIM and ABDUL AL-AIDAY | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Appearances: Allan John-Baptiste, Assistant United States Attorney, on behalf of the United States; K. Glenda Cameron, Law Offices of K. G. Cameron, on behalf Defendant Khaled Salim; Emile A. Henderson, III, Law Office of Ross-Edwards and Henderson, LLP, on behalf of Defendant Abdul Al-Aiday

### AMENDED MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS

Finch, Senior Judge

THIS MATTER is before the Court on Defendant Khaled Salim's ("Defendant") Motion to Suppress. Defendant was indicted for entering into a fraudulent marriage for the purpose of evading the immigration laws in violation of 8 U.S.C. § 1325(c) and falsely representing himself as a citizen of the United States in violation 18 U.S.C. § 911. Defendant seeks to suppress statements that he allegedly made to law enforcement officers on the grounds that they were obtained in violation of his Fifth Amendment right against self-incrimination and Sixth Amendment right to counsel. The Government opposes Defendant's Motion. A hearing on Defendant's Motion to Suppress was held on January 25 and 26, 2010. For the reasons stated below, the Court grants in part and denies in part Defendant's motion.

I.      **<u>Findings of Fact</u>**

On or before March 7, 2010, Special Agent Yusuf Adeen of Immigration and Customs Enforcement ("ICE"), Department of Homeland Security, received an anonymous tip that that an illegal alien by the name of Khaled Salim was working at the Diamond Girl Beauty Salon in St. Croix, United States Virgin Islands.[1]  On March 7, 2010, dressed in civilian clothes and without visible weapons, S/A Adeen and S/A Dennis Carter, also from ICE, traveled to the Diamond Girl Beauty Salon to investigate this tip.  Shortly after arriving, the agents went to the back room where they encountered Ahmad Hannun.  They informed Hannun that they were looking for Khaled Salim and asked Hannun for his ID.  Hannun complied.[2]

At the salon, the agents also encountered a male, who, unbeknownst to them, was Khaled Salim.  They identified themselves as ICE agents and informed him that they were looking for Khaled Salim.[3]  Defendant Salim replied that he did not know Khaled Salim and that Salim did not work at the salon.  Defendant then stated that he was a United States citizen.  S/A Adeen asked Defendant for identification.  Defendant replied that he kept his identification documents at home.  The agents then asked Defendant if he had any identifying documents on his person including a passport or social security card.[4]  In response, Defendant produced a photocopy of a

---

[1] On cross-examination, S/A Adeen admitted that prior to visiting the salon on March 7, 2010, he had taken no action to verify the information contained in the tip and that he lacked a physical description of Khaled Salim.

[2] When asked at the suppression hearing whether he felt compelled to provide the agents his ID, Mr. Hannun testified that he gave it to them voluntarily.  He also indicated that the agents spoke to him in a normal tone and did not raise their voice.

[3] S/A Adeen testified that he and S/A Carter identified themselves as ICE agents upon entering the salon.  Ahmad Hannun testified that they did not identify themselves to him, that he learned that they were from ICE from Salim but that he was not present when the agents spoke to Salim.

[4] S/A Adeen testified that the questions posed to Defendant at the beauty salon were in a normal conversational tone and that no threats were made to Defendant.

2

Florida driver's license bearing the name Mazen Abdel Nabi.[5] After receiving this photocopied license, S/A Adeen called immigration dispatch in San Juan and requested information concerning Mazel Abdel Nabi. ICE dispatch responded that they found no one by that name in the ICE database. S/A Adeen then told Defendant that he needed to see his real ID. Defendant again stated that he kept identification at his home. S/A Adeen then told Defendant that he had to come with them to the local ICE office so that ICE could verify his identity. S/A Adeen testified that, at this point, Defendant had no choice but to accompany them to the ICE office and that he felt that he had probable cause to arrest Defendant for using a false identification document in violation of 18 U.S.C. § 1028.[6]

Defendant left the salon with Agents Adeen and Carter and all three drove in the same car from the Diamond Girl Beauty Salon to the ICE office (located at Sunny Isles). The drive took approximately ten minutes. During the drive over to the ICE office, Defendant spontaneously stated that his name was Khaled Salim and that he had some identifying documents back at the beauty salon.[7]

Agents Adeen and Carter and Defendant arrived at the ICE office.[8] Defendant was placed in leg irons. After arriving at the ICE office, Defendant asked to make a phone call. He phoned a friend, Fathi Hannun, and asked him to call a lawyer and to bring over his documents

---

[5] At the suppression hearing, a copy of this photocopy was admitted as Gov't. Ex. A.
[6] Section 1028 of Title 18 of the United States Code contains a litany of federal offenses concerning the use of a fraudulent identification including the knowing production of a false identification document and knowing possession of a fraudulent identification with the intent to defraud the United States. *See* 18 U.S.C. § 1028(a).
[7] Ahmad Hannun testified that Defendant lived in a back room at the beauty salon.
[8] S/A Adeen estimated that the ICE office was staffed by 5 or 6 people when they arrived and that the office was spacious enough to accommodate everyone comfortably.

3

to the ICE office.[9] Fathi Hannun complied and delivered a black portfolio to the ICE office.[10] Upon receiving the black portfolio from Fathi Hannun, S/A Adeen received permission from Defendant to review the documents inside. One of the documents was a passport and visa. Using Defendant's passport and visa, S/A Adeen learned that Defendant was not a United States citizen. S/A Adeen also learned that Defendant had been admitted to the United States in 2006 for the purpose of attending college in Florida, but had not gone to college in Florida and had instead traveled to St. Croix.

S/A Adeen then questioned Defendant. During that questioning Defendant confirmed that he was not attending college in Florida. Defendant also answered questions regarding his date of birth, nationality, when and where he was admitted to the United States, the purpose for his visit to the United States, whether he had an immigration petition pending and whether he was married.[11] Defendant acknowledged that he was married to Marilyn Bermudez. S/A Adeen asked if Ms. Bermudez had filed any immigration papers on his behalf and Defendant responded "no, she wanted more money." In the middle of this questioning, S/A Adeen ran Defendant's fingerprints and confirmed that he was Khaled Salim and that he was not a United States citizen.

---

[9] There is no evidence that any of the ICE agents were aware that Defendant had asked Fathi Hannun to contact a lawyer on his behalf. Defendant's request to his friend to contact a lawyer was insufficient to invoke his right to counsel. *See Berghuis v. Thompkins,* 130 S.Ct. 2250, 2259 (U.S. 2010) ("If an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation . . . or ask questions to clarify whether the accused wants to invoke his or her Miranda rights.") (quoting *Davis v. United States*, 512 U.S. 452, 459 (1994)).

[10] Fathi Hannun testified that he called an attorney on behalf of Defendant and that he asked S/A Adeen if he could "bail out" Defendant to which S/A Adeen replied in the negative. S/A Adeen testified that he could not recall if Hannun had asked to bail out Defendant.

[11] S/A Adeen testified that he asked if Defendant was married because that might mean that there could be a pending immigration petition on his behalf.

4

After the interview, S/A Adeen formally arrested Defendant for violating the immigration laws and mirandized him.  Defendant invoked his right to counsel and refused to answer more questions.  Defendant was then turned over to the Detention and Removal Operations Department of ICE who transferred him to Miami for a determination of whether he would be removed from the United States.  After a period of detention in Miami, he was released by immigration officials on bail and flew back to St. Croix.

Sometime after Defendant was transported to Miami, S/A Adeen contacted Ms. Bermudez and asked her if she would come in for questioning.  She complied and confessed that she entered into a "sham marriage" with Defendant.  On September 21, 2010, Defendant was indicted for marriage fraud and an arrest warrant was issued for Defendant. On October 28, 2010, S/A Adeen and three other law enforcement members entered Diamond Girl Beauty Salon and proceeded to the back room where they found and arrested Defendant.   S/A Adeen then transported Defendant to the ICE office.

At the ICE office, S/A Adeen explained the arrest warrant to Defendant and mirandized him.  S/A Adeen read Defendant his rights from a form and also asked Defendant to read his rights aloud from the same form.  S/A Adeen asked Defendant if he needed an interpreter.[12]  Defendant declined the offer.  Defendant then signed a form waiving his rights.  (Gov't. Ex. C.)

S/A Adeen and S/A Christopher McGrath then proceeded to interrogate Defendant.  During this questioning, Defendant stated that he and Ms. Bermudez met at the Diamond Girl Beauty Salon through Abdul Al-Aiday, that they were married on St. Thomas, and that Al-Aiday

---

[12] S/A Adeen testified that he heard Defendant speak on March 7, 2010 and on October 28, 2010 and that on both occasions, Defendant spoke English proficiently enough to carry on a conversation.

5

witnessed the marriage. He also admitted that he gave Ms. Bermudez money, that they did not live together, have children together or have any assets together. Defendant also revealed that Ms. Bermudez became pregnant by another man.[13]

## II. Analysis

Defendant seeks to suppress all statements that he allegedly made to law enforcement on the basis that they were obtained in violation of his Fifth Amendment right against self-incrimination and his Sixth Amendment right to counsel.[14] The Court deals with the statements at issue in chronological order.

### a. Statements Made on March 7, 2010 at the Diamond Girl Beauty Salon

When questioned on March 7, 2010 by S/A Adeen at the Diamond Girl Beauty Salon, Defendant allegedly told S/A Adeen that he did not know Khaled Salim, that he did not work at the salon and that he (Defendant Salim) was a United States citizen. Defendant seeks to suppress these statements on the grounds that they were obtained in violation of his Fifth Amendment right against self-incrimination.

---

[13] S/A Adeen made a report of this interrogation which was admitted as Government's Ex. B. The report indicates that Defendant also admitted that: 1) he only knew Ms. Bermudez for two months before they were married; 2) that he married her because he loved her but that she had never done anything to demonstrate her love for him; 3) that on three occasions, Ms. Bermudez threatened to report him to immigration authorities if he did not pay her; 4) that Ms. Bermudez was cheating on him with another man while they were married; and 5) that Ms. Bermudez's parents did not know that they were married. (Gov't. Ex. B.)

[14] In its opposition to Defendant's motion, the Government took the position that it was only seeking to use statements made by Defendant at the Diamond Girl Beauty Salon on March 7, 2010 and statements made by Defendant during his October 28, 2010 interrogation at the ICE office. (*See* Gov't. Opp. at 3, Doc. 56.) However, at the January 25, 2010 suppression hearing, the Government reversed course and stated that it wished to use all statements made by Defendant in its case-in-chief. Accordingly, we must determine whether any of Defendant's statements are excludable.

"Under the prophylactic rules announced in *Miranda v. Arizona*, a statement made by a suspect in response to custodial interrogation after he or she has elected to remain silent is inadmissible at trial." *United States v. Calisto*, 838 F.2d 711, 716 (3d Cir. 1988). However, in order to invoke *Miranda*'s exclusionary rule, the statement must have been obtained during a custodial interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 299-300 (1980); *United States v. Mesa*, 638 F.2d 582, 584 (3d Cir. 1980) ("Miranda warnings are designed to protect against the evils of 'custodial interrogation,' and they are not intended to unduly interfere with a proper system of law enforcement or to hamper the police's traditional investigatory functions."). Statements made outside of a custodial interrogation are not subject to exclusion under *Miranda*. *Innis*, 446 U.S. at 300.

Here, the facts do not suggest that Defendant was in custody when he was questioned by S/A Adeen at the beauty salon. For *Miranda* purposes, a suspect is in custody if a "reasonable person" in the suspect's position would not feel free "to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). The custody inquiry is an objective test that ultimately asks whether there has been a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (quotation omitted). When "the individual has not been openly arrested when the statements are made, something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates they would not have heeded a request to depart or to allow the suspect to do so." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (quoting *Steigler v. Anderson*, 496 F.2d 793, 799 (3d Cir.), *cert. denied*, 419 U.S. 1002 (1974)).

When S/A Adeen initially spoke to Defendant at the beauty salon, Defendant was not under arrest. He was not placed in handcuffs nor told that he was not free to leave. During this questioning, neither Agents Adeen nor Carter had their weapons drawn or even visible on their persons. When asking Defendant about his identification, S/A Adeen spoke in a normal tone and made no threats. The other individual questioned by law enforcement at the salon, Ahmad Hannun, testified that he did not feel compelled to respond to their questions, but that he did so voluntarily. Furthermore, Defendant was questioned in a store where he worked and not at a police station. *See United States v. Willaman*, 437 F.3d 354, 360 (3d Cir. 2006) ("When a person is questioned 'on his own turf,' we have observed repeatedly that the surroundings were 'not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation.'") (quoting *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004)). In short, when Defendant was initially questioned at the salon on March 7, 2010, there were no circumstances present that would counsel an objectively reasonable person that he or she was not free to leave the salon. Accordingly, the Court finds that Defendant's statements made on March 7, 2010 at the Diamond Girl Beauty Salon were not obtained in violation of *Miranda*.[15]

---

[15] At the suppression hearing, Defendant indicated that his motion was also based on the Fourth Amendment. However, Defendant made no argument as to how his Fourth Amendment rights were implicated by the actions of law enforcement. If Defendant meant to challenge his initial encounter with ICE agents as an illegal seizure, that argument would fail. "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, [and] ask for identification' without running afoul of the Fourth Amendment's prohibitions." *United States v. Smith*, 575 F.3d 308, 312 (3d Cir. 2009) (quoting *United States v. Drayton*, 536 U.S. 194, 201 (2002)). Here, no facts were adduced to suggest that the initial encounter between ICE agents and Defendant was anything other than consensual.

b. **Statements Made on March 7, 2010 in Car Ride From the Diamond Girl Beauty Salon to the ICE Office**

After Defendant was found to have falsely represented his identity to S/A Adeen, he was instructed that he would have to accompany the ICE agents to their office in order to verify his identity. During the car ride over, Defendant spontaneously identified himself as Khaled Salim. Even though Defendant was arguably in custody (the Court will address that issue below), there is no evidence that this statement was made in response to a question or statement by the ICE agents. Accordingly, it was not obtained as a result of interrogation and is therefore not subject to *Miranda*'s exclusionary rule. *See Arizona v. Mauro*, 481 U.S. 520, 529 (1987) (holding that defendant's statements were admissible because "his volunteered statements cannot properly be considered the result of police interrogation."); *Innis*, 446 U.S. at 303 (finding statements made by defendant in police car following brief conversation between police officers not the product of an interrogation because "[t]his is not a case where the police carried on a lengthy harangue in the presence of the suspect."); *Calisto*, 838 F.2d at 713 (finding that defendant's spontaneous "blurt-out" was not made as a result of interrogation); *United States v. Davis*, 2010 WL 2405353, at *5 (D.V.I. 2010) (Finch, J.) (finding that statement made by defendant in response to conversation between two police officers was not the product of an interrogation for *Miranda* purposes).

c. **Statements Made on March 7, 2010 at the ICE Office**

Defendant also seeks to suppress the statements that he allegedly made to agents at the ICE office on March 7, 2010. *Miranda*'s exclusionary rule only applies to statements obtained as a result of a custodial interrogation. *Innis*, 446 U.S. at 300. Here, the Court has little trouble

finding that Defendant was in "custody" while at the ICE office on March 7, 2010. At the hearing, the Government wisely conceded this point – for good reason. Defendant had been ordered to accompany agents to the ICE office and, according to S/A Adeen, was given no choice in the matter. Upon arrival at the ICE office, Defendant was placed in leg-irons. "A person is in custody when he either is arrested formally or his freedom of movement is restricted to 'the degree associated with a formal arrest.'" *Williman*, 437 F.3d at 359 (quoting *Leese*, 176 F.3d at 743). Defendant's freedom of movement was clearly restricted and an objectively reasonable person in Defendant's shoes (or shackles) would not have felt free "to terminate the interrogation and leave." *Thompson,* 516 U.S. at 112. Accordingly, Defendant has met the "custody" prong of the *Miranda* test.

The next step in the *Miranda* analysis is to determine whether Defendant's statements were made in response to an interrogation. "[T]he term 'interrogation' under *Miranda* refers ... to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect . . . An incriminating response is any response-whether inculpatory or exculpatory-that the prosecution may seek to introduce at trial." *United States v. Brownlee*, 454 F.3d 131, 146 (3d Cir. 2006) (citing *Innis*, 446 U.S. at 300-301). The Government urges that the questions posed by S/A Adeen were "routine" background questions and had nothing to do with any potential or pending criminal charges and were therefore not likely to elicit an incriminating response.[16]

---

[16] The Court is aware that *Miranda* warnings do not have to be given by immigration officials prior to questioning individuals at a border crossing. *See, e.g. United States v. Kiam*, 432 F.3d 524, 529 (3d Cir. 2006) ("While an alien is unquestionably in 'custody' until he is admitted to the country, normal *Miranda* rules simply cannot apply to this unique situation at the border.").

10

Prior to questioning Defendant, S/A Adeen knew that Defendant had claimed that he was Mazen Abdel Nabi and was a United States citizen. However, before they even left the salon, S/A Adeen had already determined that Defendant was not Mazen Abdel Nabi, but was in fact Khalid Salim, a suspected illegal alien. S/A Adeen testified that even though Defendant had not been formally arrested at the salon, his proffer of the photocopied ID was sufficient probable cause to arrest Defendant for violating federal fraudulent identification laws, including 18 U.S.C. § 1028.[17] At that point, S/A Adeen should have known that any questions posed to Defendant regarding his real identity and status as a United States citizen, including his marital status,[18] were likely to elicit statements that could be used against Defendant in a trial for violating federal identity laws, including 18 U.S.C. §§ 911 and 1028.[19] Accordingly, S/A Adeen's questioning of Defendant was an "interrogation" for *Miranda* purposes.

---

However, the detention at issue did not occur at the border and Defendant had long since been admitted into the country.

[17] In addition, falsely representing oneself as a United States citizen is also a federal felony. *See* 18 U.S.C. § 911. Indeed, Count 3 of the Superseding Indictment charges Defendant with violating 18 U.S.C. § 911 based on his representing himself as "Mazen Abdel Nabi, [] a U.S. citizen [] by presenting a photo copy of driver's license issued to such person" on March 7, 2010. (Superseding Indictment, Doc. 45.)

[18] The Government urges the Court to parse out each question posed by S/A Adeen to determine whether it fits the definition of an "interrogation" for *Miranda* purposes. Under these circumstances, the Court declines the Government's suggestion. As stated by the Supreme Court, "[t]he privilege against self-incrimination protects the individual from being compelled to incriminate himself in *any manner*; it does not distinguish *degrees of incrimination*." *Miranda v. Arizona*, 384 U.S. 436, 476-77 (1966) (emphasis added). The Government had reason to suspect Defendant of being illegally in the country, using a false identification, and falsely claiming that he was a United States citizen. At that point, any statement by Defendant pertaining to his identity, nationality, or presence in the country was potentially incriminating.

[19] *United States v. Gonzalez-Sandoval*, 894 F.2d 1043 (9th Cir. 1990), cited by the Government at the suppression hearing, is instructive on this point. In *Gonzalez-Sandoval* the Ninth Circuit held that routine biographical questions do "not constitute interrogation sufficient to trigger constitutional protections . . . because the relevant questions rarely elicit an incriminating response . . . That exception is inapplicable, however, where the elicitation of information regarding immigration status is likely to inculpate the respondent." *Id*. at 1046. The Court went on to find that the defendant's statements concerning his place of birth and immigration status

11

It is uncontested that Defendant was not mirandized prior to making the March 7, 2010 statements at the ICE office. Because the Court finds that Defendant made those statements during a custodial interrogation, they were obtained in violation of *Miranda* and must be suppressed.[20] *See Brownlee*, 454 F.3d at 148 (holding the confession obtained through custodial interrogation without *Miranda* warnings must be excluded); *United States v. Jacobs*, 431 F.3d 99, 104 (3d Cir. 2005) ("If *Miranda* warnings are not given before a person 'in custody' is questioned, evidence resulting from the questioning must be suppressed.").

### d. Statements Made on October 28, 2010 at the ICE Office

Defendant also seeks to suppress statements that he allegedly made October 28, 2010 at the ICE office. The Government argues that Defendant made those statements knowingly and voluntarily after he had been properly mirandized. Defendant claims that his waiver was not knowingly made because he did not understand his rights due to his lack of comprehension of English and that the waiver was ineffective because it flowed from a prior violation of *Miranda* – the March 7, 2010 interrogation.

"A defendant may waive his *Miranda* rights if the waiver is made knowingly, intelligently, and voluntarily." *United States v. Pruden*, 398 F.3d 241, 246 (3d Cir. 2005) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). In order to be valid: (1) "the waiver must have

---

were obtained in violation of *Miranda* because they were elicited by a border patrol agent who had reason to suspect the defendant of being a deported alien who had illegally reentered the United States. As in *Gonzalez-Sandoval*, prior to questioning Defendant, S/A Adeen also had reason to suspect that Defendant may have violated federal fraudulent identification laws, including by falsely representing himself as a United States citizen, yet nonetheless elicited biographical information from him that could be used as evidence against him in a trial for violating those laws.

[20] Only Defendant's statements are suppressed. The Court notes that Defendant gave ICE agents consent to search through the black portfolio brought to the station by Fathi Hannun. Accordingly, any information obtained through these documents is not subject to suppression.

12

been voluntary 'in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception' " and (2) "the waiver 'must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.' " *United States v. Velasquez*, 885 F.2d 1076, 1084 (3d Cir. 1989) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). "Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Pruden*, 398 F.3d at 246 (quoting *Moran*, 475 U.S. at 421).

Here, the Court finds that on October 28, 2010, Defendant understood his rights and the consequences of waiving them. First, prior to being read his rights, Defendant was offered an interpreter and declined. His claim that he did not understand English sufficient enough to understand his rights is inconsistent with his decision to turn down the offer of an interpreter.[21] Furthermore, in March 2010, he had previously exercised his right to counsel after being mirandized and refused to answer further questioning. This demonstrates comprehension of his rights. *See Pruden*, 398 F.3d at 246 (prior experience with criminal justice system and *Miranda* warnings weighs in favor of finding that defendant knowingly waived his rights). The Court does not see how Defendant's English comprehension could somehow have significantly declined over the seven month period from March to October during which he remained in the United States. Finally, there is ample evidence that Defendant was read each right, read them aloud himself, acknowledged his understanding of his rights and then signed a waiver form. On the record before the Court, there is nothing to suggest that Defendant did not comprehend his *Miranda* rights or the consequences of waiving them.

---

[21] We note that Defendant had also declined the offer of an interpreter during his March 7, 2010 interrogation and that Defendant has been in the United States since 2006.

13

Next, the Court address the voluntariness of Defendant's waiver. Defendant argues that his waiver on October 28, 2010 was not voluntary because it was tainted by his prior statements obtained in violation of *Miranda* and that the questioning on October 28, 2010 could not have occurred absent the initial March 7, 2010 *Miranda* violation.

Defendant's argument raises the issue of what effect an unwarned statement has on a subsequent properly warned statement. The Supreme Court first addressed this issue in *Oregon v. Elstad*, 470 U.S. 298, 314 (1985), where it stated that:

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Id*. at 309.[22] *Elstad* further held that absent coercion or improper tactics in obtaining the initial statement, a post-*Miranda* statement is not to be automatically excluded because of an earlier, pre-*Miranda* confession. *Kiam*, 432 F.3d at 531 (citing *Elstad* 470 U.S. at 318).

---

[22] In *Wong Sun v. United States*, 371 U.S. 471 (1963), the Supreme Court held that "evidence and witnesses discovered as a result of a search in violation of the Fourth Amendment must be excluded from evidence." *Elstad*, 470 U.S. at 305-306. *Elstad* rejected application of the "fruit of the poisonous tree" doctrine when the issue was a technical violation of *Miranda*'s prophylactic warnings as opposed to violation of a defendant's Fourth Amendment rights. *Elstad*, 470 U.S. at 306-307 ("[A] procedural *Miranda* violation differs in significant respects from violations of the Fourth Amendment, which have traditionally mandated a broad application of the "fruits" doctrine . . . The Miranda exclusionary rule, however, serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself. It may be triggered even in the absence of a Fifth Amendment violation . . . Failure to administer *Miranda* warnings creates a presumption of compulsion . . . But the *Miranda* presumption, though irrebuttable for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as inherently tainted.").

In *Missouri v. Seibert*, 542 U.S. 600 (2004), the Supreme Court revisited the issue, and a four member plurality, joined by Justice Kennedy, determined that:

> [A] court must decide whether the officers made a 'deliberate' choice to flout *Miranda* in the first round of interrogation . . . If so, the second confession could still be admitted if 'curative' measures were taken-for example, a sufficient break in time or circumstances between interrogations, or a warning to the suspect that the first statement could not be used against him. . . If the failure to give *Miranda* warnings was inadvertent, however, Justice Kennedy stated that '[t]he admissibility of postwarning statements should continue to be governed by the principles of *Elstad*.'

*Kiam*, 432 at 532 (quoting *Seibert*, 542 U.S. at 621-22); *see also United States v. Naranjo*, 426 F.3d 221 (3d Cir. 2005) (applying *Elstad-Seibert* framework but remanding so that district court could determine whether agents had intentionally omitted *Miranda* warnings at initial interrogation).

The Court does not believe that Agents Adeen and Carter intentionally omitted *Miranda* warnings prior to questioning Defendant on March 7, 2010. Notably, Defendant makes no claim that the agents intentionally withheld *Miranda* warnings. Unlike the police in *Seibert*, there is no evidence that ICE had an official policy of questioning suspects without first giving *Miranda* warnings and then obtaining a second statement after administering warnings. *See Seibert*, 542 U.S. at 616.[23] To the contrary, Defendant's first interrogation took place seven months before his subsequent interrogation and lacked any of the indicia of "a police strategy adapted to

---

[23] That policy consisted of administering an unwarned "systematic" and "exhaustive" interrogation "managed with psychological skill" at the police station. *Seibert*, 542 U.S. at 616. "The warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment. When the same officer who had conducted the first phase recited the *Miranda* warnings, he said nothing to counter the probable misimpression that the advice that anything Seibert said could be used against her also applied to the details of the inculpatory statement previously elicited. In particular, the police did not advise that her prior statement could not be used . . . The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given." *Id*. at 616-17.

undermine *Miranda* warnings" present in *Seibert*. *Id*. Furthermore, while this Court rejected the Government's argument that the March 7, 2010 questioning of Defendant was not an actual "interrogation" for *Miranda* purposes, it is not wholly unreasonable for S/A Adeen to have actually believed that it was not an "interrogation." The questions asked by the agents were biographical and it may not have been obvious to them that they were likely to elicit inculpatory statements.[24] And once Defendant stated that his wife had not filed an immigration petition on his behalf because "she wanted more money," agents ceased questioning Defendant and read him his rights. These facts lead the Court to conclude that the failure to mirandize Defendant was not intentional.

Having determined that ICE agents did not intentionally withhold *Miranda* warnings at the March 7, 2010 interrogation, the Court now turns to the inquiry posed by *Elstad* – that is whether the unwarned statements were obtained by "actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will." *Elstad*, 470 U.S. at 309. In making this determination, the Supreme Court has instructed that courts must "examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his [initial] statements." *Kiam*, 432 F.3d at 532 (citing *Elstad*, 470 U.S. at 318).

The Court finds that Defendant's initial unwarned statements were not obtained through coercion. No oppressive tactics were used against Defendant. He was allowed to use the phone, the bathroom and was provided water. The agents did not badger him, made no threats, displayed no weapons, and used a normal conversational tone. They made no promises that his

---

[24] The Court notes that the test for whether questioning is an "interrogation" is whether the officer *should have known* that the questions were likely to elicit an incriminating response, not whether the officer *did* know. *See Brownlee*, 454 F.3d at 146 (emphasis added).

16

cooperation would help him. *See United States v. Walton*, 10 F.3d 1024, 1031 (3d Cir. 1993) (finding that statement obtained after promise by police to defendant not to use his statement was obtained through coercion). The ICE office was spacious and comfortably accommodated everyone present. The Court concludes that the circumstances surrounding Defendant's initial unwarned statements do not support a finding of coercion or improper tactics. *See Kiam*, 432 F.3d at 533 (finding that initial unwarned statement was not obtained through coercion or improper tactics).

Finally, as noted above, prior to his interrogation on October 28, 2010, Defendant was given a complete and thorough recitation of his *Miranda* rights. Defendant voluntarily waived those rights and spoke with ICE agents. Accordingly, the Court concludes that Defendant's October 28, 2010 statements were not tainted by the March 7, 2010 unwarned statements in such a way as to require their suppression. *Id.* (finding that the second statement was admissible despite earlier unwarned statement because first statement was uncoerced and second statement followed full *Miranda* warnings); *Naranjo*, 426 F.3d at 229 ("[W]here the statement is voluntary but made without the benefit of proper *Miranda* warnings, '[a] subsequent administration of *Miranda* warnings ... should suffice to remove the conditions that precluded admission of the earlier statement. In that case, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.'"") (quoting *Elstad*, 470 U.S. at 315).

### III.  Conclusion

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's Motion to Suppress. Accordingly, it is hereby **ORDERED**

The statements made by Defendant at the Diamond Girl Beauty Salon on March 7, 2010 are **NOT SUPPRESSED;**

The statement made by Defendant during the car ride over from the Diamond Girl Beauty Salon to the ICE office at Sunny Isles on March 7, 2010 is **NOT SUPPRESSED;**

The statements made by Defendant during his questioning by ICE agents at the ICE office on March 7, 2010 are **SUPPRESSED**;

The statements made by Defendant during his questioning by ICE agents at the ICE office on October 28, 2010 are **NOT SUPPRESSED.**

**ENTERED**:

Dated: February 3, 2011

_____/s/_____
RAYMOND L. FINCH
SENIOR U.S. DISTRICT JUDGE